Thank you, Your Honor. May it please the Court, I'd like to reserve three minutes for rebuttal. I represent Kimberly-Clark and I'm going to focus on three main points today. First, the Court should reverse the class action judgment in this case because California law imposed no duty to disclose and this is a pure omissions case. Second, the Court should eliminate or reduce the punitive damage award to at most a one-to-one ratio to compensatory damages to comport with due process and in the alternative, the Court should decertify the class or order a new trial because the class proceedings were unfair and confusing. Let me start with the duty to disclose point. The California courts in this court have held that in a case like this where it's a pure omissions case, the class was certified only on omissions, not on an affirmative misrepresentation claim. In order for a plaintiff to prevail, they must demonstrate that the product posed an unreasonable safety hazard. And here, for a duty to disclose to arise. Here as a matter of law, Bahamas, the named plaintiff failed to meet that standard. They didn't really even try. The record is undisputed that of the three point, but over three million gowns that were sold in California during the class period, there were no injuries and no reported strikethroughs, which is the whole claim here. Worldwide, 42 million gowns were sold, no reported injuries, 37 strikethroughs. So on that record, there cannot be a finding that there was an unreasonable safety hazard, therefore there was no duty to disclose. The other point that I think is really crucial here on this point is that the district judge in refusing to grant an injunction found specifically after hearing all the evidence, and I'll just quote it because I think it's dispositive, that quote, because there was no evidence that anyone had suffered physical harm while wearing a micro cool gown as a result of a strikethrough or a torn sleeve, the court cannot presume without competent evidence that class members likely will suffer harm due to future micro cool gown use. That's close quoted to ER 86. So the court found that there wasn't even a risk of injury going forward that would justify an injunction. And on that basis, the court should reverse and render judgment. Bahamas didn't put on an expert who tested the gown. They didn't dispute this data. They don't dispute it in their brief. They did have anecdotal testimony and general testimony from several former employees who talked about compliance issues, but they didn't tether it to their claim here. The claim is that the gowns had what's called the Amy Level 4 label and that they met that testing standard for marketing purposes and that supposedly three tests didn't meet that standard. They ignore the 10 tests that occurred back in 2010. The FDA certified the gowns to have this label. They ignore the 14 tests after once the new standard was put in place, but they have no evidence of any injury. And this court's decision in the Williams case makes very clear that in a case like this, where it's not an affirmative misrepresentation case, where it's not an express warranty case, conjecture and speculation is not enough. The court said a party's allegations of an unreasonable safety standard, this is in Williams, must describe more than merely conjectural and hypothetical injuries. And the court noted in Williams that it was a notable admission that in that case there were no allegations that any consumer, let alone the case, had been injured. And here, Bahamas admitted no injury to it or any of its staff members, no strike through. That's the claim, the risk to it. It put on no evidence of any other class member. So for those reasons, they just meet, they fail to meet the basic standard of unreasonable danger. The second issue I'd like to address briefly is the punitive damage issue. It dovetails with that issue of unreasonable danger. The FDA cleared the gowns for marketing with the AMI Level 4 label. And I should add, the fact that a gown doesn't meet AMI Level 4 does not mean it's dangerous. It does not mean it's defective. It's one standard. Here there was clearance from the FDA, no injuries as I mentioned, and there was no notice for purposes of due process that a company could be punished for marketing gowns that did not cause any harm or cause any injury. Yes, Your Honor. Let me interrupt for just a moment. Sure. Taking the point that we have no proof of actual injury, I assume that gowns that are certified at this higher level command a higher price on the market? Well, here, Your Honor, actually the record reflects that the gowns were marketed before 2010 without the AMI Level 4 certification. Once they obtained that certification and or the clearance, the label was put on and the price did not go up. So the price did not increase. Well, that doesn't mean they don't command a higher price in the market. It just means that the individual price doesn't go up. We're all familiar with enough economics to know that prices fluctuate for a variety of reasons or stay stable for a variety of reasons. So I come back to my question. Is it a fair inference that a higher level of certification allows them allows it to command a higher price? Your Honor, I don't think the record reflects that. But even if it did, Your Honor, that takes us into the class certification issues that the vast majority of the classes the district court found did not know about the AMI Level 4 label when they made the purchase. And we did a survey. It's in the in the record. It's not I don't think it's disputed. Mr. Ezner will correct me. It said only 2.7 percent of the 111 people that were surveyed even knew or knew what it meant or cared about that certification. Seventy five percent didn't know what it meant. So I don't think it's a fair inference from this record that the AMI Level 4 label and clearance was causing higher prices. And why would Kimberly Clark seek the higher level of certification? It allowed it to market more broadly to different types of users. So that is the record does reflect and plaintiffs emphasize this that the company marketed to particular surgeons that might and entities that might have used need for this particular level of gown. But they were sold more widely. And I think the court, Your Honor, Judge Fletcher, you've seen the CPTs, the customer, the trays that would come prepackaged. So some people cared more than others. That's why this couldn't be a class. And so and so it broadens the market for for these gowns. But it didn't necessarily raise the price. And there's really no evidence in the record on that point. On the punitive damages on the size, the punitive damages, Your Honors, this court, following what the Supreme Court said in State Farm v. Campbell, has held that a punitive damage award less than $100,000 is substantial. Courts around the country have held that under State Farm, where the punitive damage award is, or the compensatories are substantial, a one to one ratio is the constitutional maximum. Here we have a nearly $4 million compensatory award against Kimberly Clark. We believe that a one to one ratio is the maximum that's constitutionally permissible, especially since this is an omissions case, no physical injury, no threat of future physical injury that would justify an injunction. All those factors point to low reprehensibility. And again, what Mr. Avenatti did in this case was try a case that he wished he had, where someone had been injured, where he had evidence of a defective product. And he said it wasn't a personal injury case, it was really a sleight of hand, a shell game where he took all these different elements of the claim. And I can see why the jury might have been inflamed. He mentioned Ebola 23 times. This case had nothing to do with Ebola. And so it produced this massive verdict. We think a one to one ratio at most is appropriate. And, excuse me, before I turn it over to Mr. Varelli, class certification. Again, the class was certified only on the basis of omissions. The plaintiff Bahamas, though, had an individual claim for affirmative misrepresentation. So it was very clever. Mr. Avenatti kept that in the case up until the second to the last day of trial. So the plaintiff Bahamas testified through its representative about their individualized experience. But there was no testimony from any other class member. None of the class members who did not see the label and therefore were not subject to an affirmative representation. We have no idea what they thought, what they did. And then at the last minute, plaintiffs pulled out the individual claim and the jury was told it could consider all the evidence in the case to apply to the whole class, even though most of the class did not have the same situation as Bahamas. So it's a complete mess in terms of what happened in terms of the class proceedings. So at a bare minimum, we'd need to decertify the class or at least have a new trial pursuant to the proper procedures. And with that, I'll turn it over to my colleague, Mr. Varelli. Thank you, counsel. Mr. Varelli. Unmute. Thank you and may it please the court. I'm Don Varelli for Halyard. I'd like to reserve one minute for rebuttal. To endorse all of Kimberly-Clark's arguments, I'd like to focus on two additional Halyard-specific points. And if time permits, I'll circle back to the broader points. First, Bahamas never purchased any gowns from Halyard, so it suffered no injury traceable to Halyard and therefore had no standing to sue Halyard. That means the case against Halyard has to be dismissed. There's no way around that. May I interrupt right here on this question? Halyard, of course, was spun off from Kimberly-Clark pursuant to an agreement, and it looks as though there's an assumption of liability by Halyard of the Kimberly-Clark liabilities. Are you saying that liability in this case was not assumed in that document? Your Honor, Kimberly-Clark and Halyard are actually having a dispute as we speak about the extent of any successor liability. But I think the key point for purposes of standing is that even if there were some successor liability on Halyard's part, that would be successor liability for injuries caused by Kimberly-Clark during the period in which Kimberly-Clark sold gowns, which ended on October 31st, 2014, and then Halyard began selling the gowns thereafter. And that might establish in some areas that Halyard had liability for whatever judgment is entered against Kimberly-Clark, but it doesn't establish... I'm reading from the agreement. Assumption of liabilities, except to set forth in Section 2.5, and we can combine that, Halyard shall call the Halyard Party to assume, depend, comply, and discharge all contractual and federal liabilities in accordance with their terms of Kimberly-Clark. But why is this liability assuming it is a liability of Kimberly-Clark? Why is it not assumed by Halyard under this provision? Your Honor, I guess the point I'd like to stress is that even if it is assumed, the judgment against Halyard was for conduct the sales of the gowns by Halyard after the period in which Kimberly-Clark was no longer selling the gowns. And it's that set of claims against Halyard that Bahamas has failed to establish standing for because Bahamas did not purchase any gowns Halyard. So whatever might be the case with respect to Halyard's liability for Kimberly-Clark's sales, the important book law, of course, is that the plaintiff has got to establish Article 3 standing for each defendant for each claim. And a claim for damages for the period after the spinoff is what's at issue here. And because Bahamas did not purchase any gowns from Halyard, it's not traceable to Halyard's conduct. Whatever might be the case about successor liability, they haven't established that they have an injury traceable to Halyard. But then that feeds into this juridical linkage question. Because the theory of liability for Halyard includes this notion of assumption of liabilities, but it says that's only part of sort of a juridical linkage between the two. Can you address that question? Because that's the ground on which the district court vested its decision of liability for Halyard. That's correct, Your Honor. And I think we could debate whether the juridical link doctrine can ever establish Article 3 standing. There is no authority in this circuit that it can, and the vast majority of courts think that it can't. But I mean, one could envision a circumstance in which that kind of analysis could result in a finding of Article 3 standing. But it would be when two entities acting in concert, such that one might be able to say that the two entities together have taken a step that create an injury that's fairly traceable to both. But you can't have that here, Your Honor, because we weren't juridically linked. We were juridically distinct. Kimberly-Clark sold the gowns before October 31st, 2014. Halyard sold the gowns after. There was no concerted action between the two selling the gowns. There were two separate companies selling at separate times. So that's why we think the juridical link doctrine, no matter how one interprets it, can't provide a basis for standing here. Really, the argument I think that my friends on the other side are pressing is that they can rely on the standing of the absent class members, some of whom did purchase from Halyard. But we think the law is very clear in the circuit, and that's Learbo and Easter and NEI, that the class representative cannot rely on standing of absent class members, has to establish standing personally. And that's the problem here. Again, the key point here is that this was sequential action. Kimberly-Clark before the date of the spinoff, Halyard after the date of the spinoff, and not the two of them acting in concert. So in order to establish a separate claim, whatever the claim is with respect to Kimberly-Clark, in order to establish a separate claim against Halyard, Bahamas had to have purchased gowns from Halyard and therefore have an injury traceable to Halyard's conduct. After all, there was a separate judgment for several hundred thousand dollars in compensatory damages for sales after the spinoff, as well as the punitive damages for sales after the spinoff. And that's what Halyard's got. That's what Bahamas has to establish, Article III standing and traceability in order to go forward on. And they didn't. As I said, I think under the clear law of the circuit and Easter and NEI and Learbo, that means that the claim has to be dismissed and the class has to be certified. And, you know, I do understand that there was some frustration on Judge Gee's part because of the way in which this unfolded. But I would like to address that because I think it's important to put it in context. The fact is that there wasn't any information asymmetry here, that long before the deadline for naming class representatives, Halyard produced its sales records. So Plans Council knew every single Halyard customer and they weren't able to find any customer who was willing to be a class representative who had purchased from Halyard. They went forward with Bahamas alone. And then they filed that amended complaint, we answered, and we raised lack of standing in the answer. So we joined that issue in the answer. And of course, under Lujan, whatever might have happened before trial, the plaintiff has a burden at trial to prove the facts of standing. They didn't. We moved for directed verdict and then for judgment as a matter of law. And we did so because there was no evidence of traceability. I just think even putting aside the fact that this is a matter of subject matter jurisdiction, which isn't laveable, I do think that we acted appropriately. This is just a failure of proof with respect to this separate set of claims. With respect to whether this is an Article III standing difficulty or some other difficulty that would cause problems for suit against Halyard. The juridical link doctrine is really not an Article III doctrine. It says, if there's been a certain level of cooperation between two entities, both may be liable. The juridical link argument was made. And if that argument is raised late, so as to be unfair to the plaintiff. Now, I don't ask you to concede that it was raised late and was therefore unfair. But if that argument is raised late, that's not an Article III standing argument. That's a merits argument. Would you agree that that's a merits argument? Respectfully, no, Judge Fletcher. It's an argument about whether the requisites of Rule 23 class certification are satisfied. That's, I think, the only context in which the juridical link doctrine has been applied. I may have misphrased the question that I'm asking a somewhat different question. There are certain requirements for the juridical link doctrine to apply. Basically, the two entities must have cooperated in some fashion, so as to produce a joint liability. That strikes me as just a question on the merits. Is there a juridical link such that both entities are liable? That does not strike me as an Article III question. Can you tell me why that should be an Article III question? Yes, I can. Because in the absence of proof of concerted action, not sequential action is here, but concerted action, the absence of proof of concerted action, one cannot trace the plaintiff's injury to both of the defendants because they're not linked in a manner that jointly produced the injury. What I'm after is the following. The juridical link doctrine is subject to proof. Let's say that juridical link was raised and was raised late after the possibility for proof had gone past. That is to say, the case had been proved on the assumption that juridical link was assumed. Can you then say, well, I don't have to provide my countervailing proof because it's Article III and I can raise it now? It doesn't matter that I didn't raise it before? Your Honor, I do think that the burden rests always with the plaintiff to establish standing, including traceability. That means that the plaintiff has got to put on the proof in its case that there was a juridical link such that there was a kind of concerted action, which one could say that both defendants are in some sense injured. They did have to do that in order to establish standing. But I will say, Your Honor, just in order to give this some more context, that the plaintiffs did have a theory of that nature that they identified in their complaint. They alleged that Halyard was the alter ego of Kimberly-Clark and therefore you could treat them as one company, that they weren't separate. And of course, if they had done that, they might have had a case for standing. But that was in their complaint, but then they didn't pursue it at trial. They didn't put in any evidence to try to establish that. I don't think they could have succeeded on it, but they didn't try. And I think that's why this unfolded in the way it did. And that was their theory, I think, of how they were going to establish standing. And then they decided they couldn't prove it and were just hoping they could get through it. As I said, Your Honor, we did raise the lack of standing in our answer, but we did join issue with that. And I do think that it really does come down to Article 3, because unless there was concerted action, then there is no injury by Halyard traceable to Bahamas. And I do think it, just stepping back, makes sense to look at it that way, in that Bahamas never bought a gown from Halyard. And Halyard didn't exist at the time that Bahamas bought the gowns from Kimberly Clark, so Halyard couldn't have contributed to the manufacture or sale of the gown that Bahamas bought that it alleged injured it, because Halyard didn't exist then. And so that seems to cancel your over your time. So we'll give you some time for a bottle both of you. Thank you. Thank you, Your Honor. Starting with Kimberly Clark's position regarding a safety hazard. Kimberly Clark's failed to mention this court's most recent decision on the issue in the circuit specifically concluded that when there's an intentional concealment that concerns the central function of the product in question, safety hazard is not an element of the tort under California law. And taking a step back for purposes of both central function and for understand that surgical gowns primary function is to protect the individuals performing medical procedures and the patients from harm as a result of passing bodily fluids or viral viruses. That's exactly what these gowns are designed to do. And that's exactly what the defect in this case failed to apprise the consumers about that these gowns had defects in them because of the ceiling primarily that protect the users and the patient from exposure to bodily fluid and viral protection. The argument is made and it's been repeatedly made that wait a minute, there's 3 million gowns during this past period. And plaintiffs could not produce evidence of an actual physical injury to any of the customers. First of all, that fails to take into consideration the number of gowns that are sitting on a shelf somewhere and haven't been used that weren't used. And it also fails to take into consideration the fact that these gowns were designed to protect or intended to protect as well against viral infection. And it may not be known. The dots may not be connected to establish that in fact, somebody who suffered a viral infection as a result of these gowns was actually able to link it up to the use of these gowns. So I don't think it's fair to say that there's no evidence whatsoever that these gowns created the safety hazard, which is the key term. It's a hazard. It's a risk. That's precisely what these gowns were designed to protect against. And it bears mention here too. This is one of several arguments defendants make made post-trial that are inconsistent with the manner in which they requested instructions on this case. They requested an instruction concerning the affirmative obligation to disclose as concealment cause of action without ever including safety hazard as an element. So they requested an instruction as to the elements of plaintiff's tort. The court gave that instruction. Nowhere did it ever mention safety hazard and nor does California law require a safety hazard under the circumstances. Anyhow, for the reasons explained in Hodson, and also because this is not a case where plaintiff was attempting to do an end run around a warranty period. This was a claim based upon a defect that existed in these gowns at the moment they were sold. Plaintiff class was sold a gown that costs more than they were worth based upon the failure to disclose. Let me ask you about you said cost more than they were worth. What evidence do we have in the record that Kimberly Clark and then Halyard were allowed to charge premium prices because of the certification? Because of the, oh, because, well, we have the evidence of our expert, Mr. Williams, who testified as to the value of the gowns if they had been represented, if they had, if the vaults in the gowns had been disclosed to the consumer class. So we know what. And review that testimony for me. I confess I have not read that testimony. He opined as to the value of each gown. And as I, as I'm talking, I can't remember the specific figures. If the disclosures that Kimberly Clark should have been made, defendants should have disclosed, were made. And then compared it to a gown without, a gown that, what the plaintiff class should have been charged for the gown if the disclosures had been made. And were the damages calculated based upon that price differential testifies, testified to by your expert? Yes. So in short. If I recall his testimony correctly, though, he didn't, he was just comparing the two gowns in terms of price. I don't think he opined specifically about consumer willingness to buy or what it was valued at. I'm sorry, Your Honor. As I recall his testimony, you can correct me if I'm wrong. He was just comparing the price of the two gowns, right? Correct. Well, he was comparing the price of the gown that was obtained by the plaintiffs and opining as to what the value of that gown would have been had the failures of that gown been disclosed to the consumer class. Right. But I don't think he, I don't think he posed a question. I don't think he opined. You can correct me if I'm wrong about what the consumer class would have paid. That was just an assumption. He, no, and that's not a necessary element of our tort. It's what the gowns were is what the element of our tort was. And that's what he opined about. And keep in mind, these were the, these were Kimberly, these were defendant's highest price gowns. They were, they were the gowns that they produced that provide, that were supposed to provide the highest level of protection to the people using them. And they did just the opposite of that. Moving, unless the court has any further questions on that, I moved on to the punitive damage argument, which strikes me as inconsistent with the argument that I read in their brief. And basically it's again, a discussion of the fact that these gowns didn't end up causing anybody any injury. And I won't repeat the argument I just made as to why that's fallacious. And bear in mind that the jury, that the jury that heard this evidence as judge, as judge G explained in her post-trial order, the sheer size of the jury's punitive damage award speaks loudly and clearly that the jury found defendant's conduct in this case to be exceedingly reprehensible. And she endorsed that view. And that view is supported by strong evidence. The argument now being made, attempting to bring plaintiff's trial counsel into this is nowhere made in any of the briefs that they argued. So I would ask the court just to disregard that. The issue that they raised concerning the 2003 versus 2012 testing, and I won't belabor that in as much as it wasn't argued, but the issue of reprehensibility was clearly found by, or the question of reprehensibility was clearly found by judge G and by the jury. And it's clearly supported by, by ample, ample evidence. I just want to reference a few points. Keith Edgert, Kimberly Clark's global director of surgical and infection prevention testified that defendants continued to sell the gowns, even though they knew about compliance problems and they knew they did not provide the promise protection against liquid barrier protection to healthcare providers. He described that he had family members in the healthcare profession and was, for that reason, offended by this pattern of conduct. Ms. Bazook, Kimberly, Mr. Bazook, Kimberly Clark's global strategic marketing director testified senior management was well aware of the failed industry testing compliance problems. And he was no priority to fix it whatsoever because making improvements to the product was in direct conflict with improving the margins on the product. They put profits over safety. This is as clear a case of reprehensible, despicable conduct, justifying punitive damages against the manufacturer that you could find. That's why the jury awarded the amount that it did. Defendants make no argument in their brief whatsoever as to the introduction of any evidence, as to an incorrect instruction being given or any other issue that would have influenced a jury to reach that verdict. It was based solely upon the evidence that was presented. They knew that these gowns, the protective qualities of these gowns were important. There's argument about a survey and Mr. Boutros said, well, maybe I'll correct him if I disagree. And I will, because that survey simply asked about AME-4. But defendants' own survey, when they actually gave a survey that was pre-litigation, explaining the qualities that were important to their consumers about gowns, that survey indicated that the top level of importance was given to the protective quality of these gowns, which only makes sense. There's no other reason to wear this product. There's no other reason this product exists except to provide protection to the people using it. And Kimberly Clark and Halyard knew this all along. They received complaints. They knew in real time these gowns were having problems and they said nothing about it. And what did we hear from Kimberly Clark's witnesses when they put them on the stand about who had knowledge about how these gowns were manufactured? We don't know, because they didn't put on any evidence whatsoever from any of their witnesses who had actual personal knowledge about the manufacturing of these defective gowns in Honduras, where there was repetitive quality issues with the machine, not property sealing the sleeves. They put on not one witness. And even to the point where, even after Halyard's chief operating officer, Chris Lowry, was questioned by plaintiffs on direct, no questions whatsoever on cross. So, they relied primarily on simply expert after-the-fact testimony attempting to justify this despicable behavior. And I want to talk quickly about the ratios that were used by Judge Gee for purposes of the punitive damages. Of course, the most important factor in considering ratio is the reprehensibility of the defendant's conduct. And I won't belabor that point. The reprehensibility here is palpable. Judge Gee found that in this court's role under Cooper, even though it independently polices the ratio, gives deference to her determination about the reprehensibility. In Planned Parenthood, this court talked about where the conduct at issue was reprehensible. There could be ratios in excess of 4 to 1, even for substantial compensatory damage cases. But Judge Gee concluded a 5 to 1 with the appropriate ratio. And this court has an independent opportunity to evaluate that ratio. And the reason Judge Gee found that ratio to be appropriate is because there had not been physical injury suffered. But respectfully, that fails to take into consideration what Campbell teaches, which is not only the actual harm that is at issue, it's the potential harm. The ratio between harm or potential harm is what Campbell speaks of. And in TXO, the plurality specifically said it's appropriate to consider the magnitude of the potential harm to other victims that might have resulted if similar future behavior was not deterred. And it gave a hypothetical about a man wildly fiery and got into a crowd but by sheer chance not hitting anyone. That's exactly what happened here. To the extent that there was no harm, and we don't know whether there was or not because we can't say for sure whether any of the consumers of this product suffered a viral infection because of it and wasn't able simply to trace it, we know that there was significant potential harm as a result of the despicable, reprehensible conduct. And I'm using those words because those are the words in the statute of these defendants and failing to disclose what they knew were critical defects in this product and failed to take any steps whatsoever to protect to disclose that to these class members in the interest of profits. And I would urge the court that under Campbell that the court could at least increase the punitive ratio to nine to one under these circumstances. It's still within the single digit. As the court knows, Campbell says that you shouldn't exceed to a significant degree single digit. It would still be within the single digit and it would correspond to the reprehensible conduct of these defendants and the potential harm in addition to the actual harm that these class members suffered. There was an argument about class certification and I'll briefly touch upon. I'm not sure exactly. It wasn't framed in terms of the arguments that were made in the brief. It was mostly framed in terms of it being a mess. One thing that I think is important to remember that those arguments all concern decertification of a class that had been certified and as Judge D found and is not refuted by the defendants in their brief, the parties seeking decertification had the burden, which is substantial regarding the propriety of class certification and doubt should be resolved in favor of certification. That's at page 33 of the court's order. That's important because a lot of the argument was, well, wait a minute. There wasn't evidence put on specifically about class members, specifically other than Bahamas, which isn't true. And I'll talk about that briefly, but that it's important because Bahamas, because defendants requested that the jury be instructed and they were instructed that you may assume the evidence that this trial applies to all class members. So they agreed to an instruction, proposed an instruction, which told the jury focus on what happened to Bahamas and assume that it applies across the board to everyone else. That's the case that was tried. And then after the fact, they say, wait a minute, you didn't put on specific evidence as the class members other than Bahamas. And therefore we are entitled to decertification. That's not the trial that the defendants put on, and they should be precluded from now switching gears after the fact to claim that somehow because plaintiffs supposedly failed to put on evidence as to the class as a whole, decertification was appropriate. But none of the arguments they make regarding decertification have merit. And I won't repeat, but the defects here were obviously material to the consumers of the gown. They would want to know about the fact that they failed to offer the viral and fluid protection that they were expecting to get. The reliance is, and that's an objective standard, not a standard. Can I interrupt for just a minute? You said that was material to the consumer. I think we have a lot of evidence that a lot of the consumers didn't know and whatever price they paid was not in their own point, from their own point of view, material to the question of whether or not these were certified at this high level. They just didn't know. Isn't that right? They may not have, all the class may not have known that there were any four gowns, but everyone in that class who purchased the gowns either individually or by way of a CPT kit knew they were purchasing surgical gowns, which they are designed by their very nature to provide protection against bodily fluids. I understand that. But I think in order for you to reveal, you've got to show or tell us that California law does not require individual reliance in the sense of I bought this gown, relying on the fact that it had this high level of certification, and therefore I paid more for it. Because if that's the law, they're right. And I think the class ought to be decertified. I don't think that's what the law is. And you better tell me why I'm right. But that's not what the law is. Well, Enriched Tobacco, two cases specifically holds that 46 Cal Forth at page 327, a presumption or at least an inference of reliance arises whenever there was a showing that a misrepresentation was material. We've got material here in spades, and therefore the reliance is presumed based upon the fact that there was a material omission. Material to what? Material to a hypothetical, objective, reasonable person or material to the individual plaintiff? It's an objective standard. Materiality is an objective standard under California law. But objective doesn't tell me everything I need to know. Objective to whom? Objective to a hypothetical, reasonable person or objective to the individual person? Objective to a, I believe it would be, I think the most accurate way I think I could respond is an objective to the class of individuals who are buying this product. So if you're selling a surgical gown to individuals performing surgery, the objective materiality that they were intending to scan, it was important to them that these gowns provide protection against bodily fluids and viral infection. If you're selling it in a Halloween store as a costume, maybe not. But in terms of this case, the objective materiality is with respect to the class of individuals, the type of individuals who are purchasing these gowns. I'd like to quickly, unless the court has further questions on that, in my one minute remaining, just briefly talk about the standing issue. So the issue in brief is that Judge G, in her order, specifically found a laundry list of the relationship between Halyard and Kimberly-Clark was sufficient to support standing by Bahamas against Halyard, including the fact that the Halyard was spun off two days before, two days after this action was filed, including the fact that the same personnel who were responsible for these gowns at Kimberly-Clark were the same personnel that were at Halyard, including the fact that the facility where these gowns were produced in Honduras was exactly the same, and the machinery, the defective machinery which created these problems was exactly the same, and including the fact that there was a contractual arrangement between Halyard and Kimberly-Clark where Halyard was going to resume responsibility for Kimberly-Clark's failures with respect to these gowns when it was producing them. If there's ever going to be a case where there's a sufficient connection between two defendants justifying a class representative who purchased gowns from one of the defendants suing both, it's this case. But as far as I can tell, the only thing you've shown there is continuity of production and continuity of personnel. I'm not sure that you've shown cooperation between the two entities such that we have satisfied the juridical link doctrine. I'm here not arguing Article 3 standing. I'm arguing whether or not you've satisfied the prerequisites for juridical link. I'm not sure you have. Well, I think the facts that we have are significant, are strong enough. But I think when coupled with the fact that this issue, whether or not the class representative purchased gowns from Bahamas was raised as a standing issue for the first time two weeks into this trial, near the very end after plaintiffs had already rested, justified Judge Gee concluding that this issue had been waived. I heard argument about standing being raised earlier. It was raised. It was raised in the context of an argument that because the plaintiffs suffered no harm whatsoever as a result of these gowns, there was no standing. And that only shows the fact that standing was argued, but not this particular standing argument as far as I could see. And therefore, it only makes it worse that this other standing was earlier argued. And it only makes stronger Judge Gee's ruling that, in fact, in essence, plaintiffs were to the extent there's any evidentiary gap in the showing with respect to why there was a juridical link, it was waived by Halyard. But we are positioned that there, in fact, is a sufficiently strong connection when you have a contractual relationship between the parties under which the party claiming lack of standing assumed responsibility for the conduct that issue, in this case, with respect to Kimberly Clark, the party from whom Bahamas purchased the gowns. I would urge that would be sufficient along with all the other factors on which Judge Gee relied. I think I'm over my time, Your Honor. Thank you. Thank you for your argument. Let's put three minutes on the clock for Mr. Boutros. Thank you, Chief Judge Thomas. Let me start in reverse order with the class certification issue because, Judge Fletcher, you put your finger on it. We have, and counsel, Mr. Ezra just admitted, we do not know what the absent class members who did not see the label, and that's what most of the absent class members thought was material. We don't know that they relied. We don't know that they would have behaved differently had they had additional information. You're on maybe two or three things. The one thing that troubles me was that I may have understood your argument before, but I understood you to say that there was no evidence in the record that there was a price differential based upon the higher level of certification, but I gather that we had testimony precisely to that effect. Now, you may say that this testimony is unreliable and so on, but how do you respond to the testimony that says, listen, because this higher level of certification, the gowns were, quote, worth more? I think I would have said higher price can be charged. I'm not sure I want to talk about a sort of ethereal notion of worth, but it sounds as though there was a price differential, at least there was evidence to that effect. How do you respond? Two things, Your Honor. Chief Judge Thomas had it right in the sense that the expert did not talk about the difference between the price if it had the AIME Level 4 label or didn't, or didn't meet that standard. He compared a different gown to the price of that gown to the micro-cool gown, so it's a very different inquiry. Second, the expert, yes. And what was the different gown? It was another Kimberly-Kart gown that he said was comparable, but it wasn't. He just pulled out another gown that did not have the qualities that this gown did, and if I can just address this, Your Honor, because I think it's really important. The case, yes, go ahead. The question is, is there evidence in the record that because of the higher level of certification, a higher price could be charged? And you're saying, well, he pulled out another gown that didn't have this, and he said there was a differential in price. That sounds as though there's a differential in price. Maybe I'm misunderstanding your argument, or maybe I need to go back and parse that testimony. It was a very different argument, Your Honor. It was a gown that didn't have the protective qualities and all sorts of other features, which the expert didn't address. But the evidence, Your Honor, shows that before the label was put on in 2010, and the gown was marketed without the AME Level 4, the price was the same as it was afterwards. The other point, Your Honor, is once this case was filed, and all these allegations were made, and all these disclosures were made, the price stayed the same. So that's evidence that the price didn't change based on the AME Level 4 label. And again, I think the class at a bare minimum has to be decertified, because we don't know what all those people who didn't know about the label, who didn't care about the label, who didn't care about this label. And here's the rub, because Mr. Esner did what Mr. Avenatti did. He used a lot of rhetoric. This case wasn't about the gowns being defective and not providing the protection that they were There's no evidence that anyone was injured. There's no evidence that there was ever a strikethrough. It's all about whether the label was crucial. It's not a personal injury case. It's not despicable conduct. It's just about that label. And the gowns performed. Judge Fletcher, we don't have any evidence that anyone didn't get the full use and protection from those gowns that they paid for. It's a claim that's without injury. I'm about to take, I'm taking over time for which I apologize, but bear with me on this one. Assume that there is evidence. Now, you don't have to concede, but assume that there's testimony from which the jury could reasonably conclude that Kimberly Clark was able to charge a higher price because of the certification. And assume further, and this is basically your argument, that many members of the class didn't know and individually didn't particularly care about the certification, but nonetheless, they were paying a higher price because of the certification. Why is that not reliance under California law and under tobacco too? Your Honor, I think because people were in different circumstances. So, some people, they bought through the different circumstances. But as I read tobacco too, it says the reliance is shown when a reasonable person would have acted in this way, not requiring that the particular individual have done so. And Your Honor, we addressed that on page 20 of our reply brief in Tucker, that there is an objective standard as long as the people are in the same circumstances. So, here, the problem is that Bahamas said it received the alleged representation. It looked at the label and it wouldn't have paid what it paid if it didn't have that label. There's no evidence as to all these other people and companies in a different position. And that's why you can't presume materiality. You can't presume reliance. I guess you and I just read tobacco too different. Okay. I'm not sure we do, Your Honor, because I think there is an objective standard. We read it differently. You do not have to show that each consumer cared about it. All you need to show is that a reasonable consumer did care about it, which is, of course, then what produces the price differential. And Your Honor, I would just say that I think the difference in our view here, at least as I'm seeing, is that I think that's correct if everyone is in the same position, that if they're similarly situated, and that wasn't the case here. And if I can, I briefly just address two other points, Chief Judge Thomas, and then I'll stop. One, the Hodson case that Mr. Esner pointed to does not in any way change Williams and Wilson. The court actually said that, that it was not changing that view. It did not adopt a new test. It just assumed that even under the test the plaintiffs were arguing, the plaintiff would have lost. So that's Hodson. And then finally, the court should, again, eliminate the punitive damages here. There's no injury. The case was about the labeling. The FDA cleared these gowns in 2010 based on past tests. They passed all the tests once the standard was changed. There's just no clear and convincing evidence of the kind of conduct that would warrant punitive damages under California law or as a matter of due process. Thank you very much. Mr. Morelli, let's put one minute on the clock as you request. You have to unmute. Thank you. I'd like to make a point about punitive damages and then circle back to the juridical link if I could. On punitive damages, with respect to the reprehensibility, of course, the question of whether the process clause would allow punitive damages here is subject to de novo review by this court. The historical facts, the court defers to, but it's de novo review of that. With respect to Halyard's reprehensibility, in addition to the points that Mr. Boutros has made, which we endorse, of course, Halyard didn't start selling these gowns until November of 2014. At that point, there had been 13 months of consistent testing showing no problem whatsoever in those prior, actually, 15 months. And then for the entire period that Halyard was selling these gowns, there was no testing problem whatsoever. So, if you look at that in combination with the points Mr. Boutros made, I suggest there really is no possibility of finding reprehensibility here. Now, with respect to juridical link, if I just could try to circle back, and I hope clear up a point or two with Judge Fletcher, based on Judge Fletcher's questions. If juridical link either is a doctrine to establish standing, or it isn't. If it isn't, then they've got the traceability problem. If it is, then it was incumbent on the plaintiff, Bahamas, to make a juridical link case in order to demonstrate its standing. But it didn't do that. It didn't try to do that. It was Bahamas that actually raised the juridical issue in response to our motion to dismiss the lack of standing. And then, with respect to whether there was a juridical link in particular, this question of, as Mr. Esner identified, the crucial nature of Halyard's agreement to be liable for Kimberly Clark's actions. I'm looking at page 98 of the excerpts of record, which is where Judge G ruled on this. He noted that the agreement requires Halyard to be liable for Kimberly Clark's conduct prior to October 2014. And, of course, it does. But the whole point here is that Bahamas sued Halyard for conduct after October 2014. And it did so without showing that it suffered any injury on the basis of Halyard's conduct after October 2014. And that's why there's no concerted action, no juridical link, why the case against Halyard had to be dismissed. Thank you. Thank you, counsel. Thank you all for your arguments today. It's been very helpful to the court, and your briefing's been excellent. And we will be in recess. Thank you.
judges: Fernandez, Thomas, W. Fletcher